**AMATA COLEMAN, Petitioner,**

**v.**

**SOLIAI T. FUIMAONO, Chief Election Officer, Respondent.**

High Court of American Samoa
Appellate Division

AP No. 20-98

October 21, 1998

Before KRUSE, Chief Justice, RICHMOND, Associate Justice, AFUOLA, Associate Judge, and ATIULAGI, Associate Judge.

Counsel: For Petitioner, Arthur Ripley, Jr.
For Respondent, Elvis R.P. Patea, Deputy Attorney General

## OPINION AND ORDER

This petition for writ of mandamus arises from a dispute regarding the eligibility of petitioner Amata Coleman ("Coleman") as a candidate for the office of Delegate to the United States House of Representatives in the upcoming November 1998 election. By letter of September 2, 1998, Coleman was informed by respondent Chief Election Officer Soliai T. Fuimaono (the "CEO") that she had failed to meet certain requirements for candidates as set forth by statute, and that she therefore would not appear on the ballot as a candidate for that office. Following unsuccessful negotiations with the CEO and his staff, discussed in further detail *infra*, Coleman filed this petition with the Appellate Division of this Court.

### Standard of Review

At the evidentiary hearing held before the Appellate Division on October 16, 1998, Coleman argued that, because there was no trial record or documentation from any other such intervening proceeding in this case, the Court should review the evidence on appeal *de novo*. Before proceeding to an analysis of the merits of this case, the threshold issue confronting the Court involves determining the proper forum in which it should be heard. In evaluating the statutes, it appears that there are two possible avenues of judicial review open to a prospective candidate who wishes to challenge the findings of the CEO.

#### A. Trial Division

■ Although A.S.C.A. § 6.0230 provides for a direct appeal from the board of registration to the Appellate Division, that provision applies only to matters involving *voter registration*. With respect to *candidates*, A.S.C.A. § 6.0301(d) says simply that, "The chief election officer shall determine whether the nominated candidates are eligible for election, and shall cause ballots to be printed for each district bearing the names of all qualified nominees." The statute otherwise remains silent regarding a prospective candidate's right to appeal such determinations.

46

■ Nevertheless, in the very case cited by Coleman in her memorandum, the Trial Division held under analogous circumstances that review would be appropriate for the limited purposes of determining "whether the decision was reached as a result of fraud, corruption, abuse of discretion or such arbitrary and capricious or unauthorized action as to constitute a denial of due process of law or as a result of a clear disregard of statutes or court determinations." *Lolotai v. Mockler*, C.A. 2853-74 (Trial Div. 1974). Similarly, in another pre-election candidate eligibility case, the Trial Division again held that petitioner must demonstrate he had been subject to "arbitrary treatment and caprice on the part of the election office." *Siofele v. Shimasaki*, 9 A.S.R.2d 3, 12 (Trial Div. 1988). Moreover, pursuant to T.C.R.C.P. 87-102, petitions for extraordinary writs seeking judicial review of executive or administrative acts or failure to act, such as the writ of mandamus prayed for in the instant case, should properly be filed in the Trial Division, where that tribunal is accustomed to conducting evidentiary hearings and taking live testimony.

B. Appellate Division

■ This case, however, was filed in the Appellate Division. Although a petition for writ of mandamus to review an executive or administrative act and/or omission properly lies with the Trial Division, we nevertheless construed the action as a petition for judicial review pursuant to the provisions of the Administrative Procedure Act, A.S.C.A. §§ 4.1001 *et seq.*, and granted petitioner's request for a hearing on the matter.[1]

Under this alternative method of appeal available to prospective candidates, a petitioner may file directly with the Appellate Division for review of official government agency decisions. A.S.C.A. § 4.1041. Although in a different forum, however, the standard of review under these circumstances is similar to that employed by the Trial Division in the cases cited above:

> The court may reverse or modify the decision of the agency, or remand the case for further proceedings, if substantial rights of the petitioner have been prejudiced because the decision of the

---

[1] The Appellate Division conducted an evidentiary hearing in this case on October 16, 1998. Although such hearings are more familiar to the Trial Division, the Appellate Division is also authorized by statute to hear such testimony: "Upon motion of any party, the court may, in its discretion, receive any evidence necessary to supplement the record." A.S.C.A. § 4.1043(a). Further, the Appellate Court Rules also provide, at the discretion of the Court, for the creation of a supplemental record. A.C.R. Rule 16(b).

47

agency is:

(1) in violation of applicable constitutional or statutory provisions;

(2) in excess of the statutory authority of the agency;

(3) made upon unlawful procedure;

(4) affected by other error of law;

(5) clearly erroneous in view of the reliable, probative, and substantial evidence in the whole record;

(6) arbitrary, capricious or characterized by abuse of discretion.

A.S.C.A. § 4.1044. In addition, the Court must give "appropriate weight to the agency's experience, technical competence, and specialized knowledge." A.S.C.A. § 4.1043(b). Given that this case is now before the Appellate Division, it is therefore these standards which will guide our analysis below.

## Discussion

In her memorandum and at the evidentiary hearing, Coleman set forth three grounds upon which she claimed that the CEO had denied her right to due process under the law. First, she claimed that among the field of candidates, she alone was wrongfully denied access to a list of registered voters which was essential in completing the paperwork necessary for her candidacy. Second, she argued that her petition was subjected to a more rigorous standard of scrutiny by the CEO's staff than were those of her competitors. Finally, she alleged that the CEO refused to consider additional evidence which she presented at his office with respect to the disputed information.

### A. Denial of a List of Registered Voters

█ The fundamental dispute in this case arises under A.S.C.A. § 6.0301(a), which requires that candidates for the office of Delegate to the United States House of Representatives be nominated by "petitions . . . signed by at least 300 registered voters of the Territory" (as amended in 1996 by Public Law No. 24-16). As the testimony revealed, this task is often complicated by the fact that such petitions require not only signatures, but also at least purport to require voter registration numbers, which prospective signatories typically do not have committed to memory and do not often carry on their persons.

To facilitate this process, therefore, the CEO has in past years made former voter registration lists available to candidates who requested such lists. This year, however, it appears that no list was made

48

available to Coleman before the September 1, 1998 deadline for filing candidate petitions. Candidates Faleomavaega Eni ("Faleomavaega") and Seigafolava Pene ("Seigafolava"), on the other hand, did have access to the 1996 voter registration list. Coleman claims that the availability of the outdated 1996 lists to the other two candidates raises two fundamental questions which the Court must resolve: a) was she entitled by law to receive a voter list, and b) if not, was her campaign nevertheless materially and unfairly prejudiced by not having the older list while her competitors benefited from its assistance?

## 1. Legal Right to a Voter Registration List

On this matter, the statute is plain and unambiguous. A.S.C.A. § 6.0301(f) provides that all candidates for the office of Delegate to the United States House of Representatives "are entitled to a list of all the qualified electors in the Territory within 10 days after the close of registration for the Territory" (as amended in 1996 by Public Law No. 24-16). The close of registration is established by statute as the 30th day prior to each election. A.S.C.A. § 6.0222.

For the November 1998 election, therefore, no candidate was entitled to a 1998 voter registration list until early October, well after the September 1 deadline for submitting candidate petitions. Indeed, regardless of the more lenient practices of prior years, no candidate received such a list this year, and we hold that it was within the discretion of the CEO to withhold the 1998 list until such time as it was required to be provided by law.

## 2. Unfair Prejudice Nevertheless Resulting

■ Coleman's claim to unfair prejudice was not borne out by the evidence. Faleomavaega did indeed have early access to a copy of the 1996 voter registration list, but it was a copy which his office had kept from the previous election. Faleomavaega's representative Alex Godinet testified that while he did seek a copy of the voter registration list from the Election Office, he did so after Faleomavaega's petition had been filed, which was about a week before the statutory deadline. He also testified that he was given, in response to his request, a copy of the 1996 voter registration list which they already had in their possession. Although the evidence also alluded to Seigafolava's having access to a 1996 voter registration list, the circumstances as to how Seigafolava obtained a copy of that list was not made clear to us.

Moreover, we are convinced on the evidence presented that no candidate received the old list without specifically requesting it. Coleman's brother, acting as her liaison with the Election Office, by

his own testimony admitted that he had requested a "current" list, and was denied what the Election Office staff apparently understood to mean a 1998 list. In this way, any prejudice resulting from not having the old list cannot be blamed on the CEO or his staff, but rather only on the fact that Coleman's representative specifically asked not for the 1996 list, but for unreleased "current" information.

Furthermore, we are far from persuaded that attaining the 1996 list would have altered the unsuccessful outcome of Coleman's petition. Although Coleman's staff obtained the petition in early July, the testimony revealed that her volunteers did not begin turning in signatures until the days immediately prior to the deadline for submitting the petition, with the last coming in on the very day that candidate petitions were due. There is no evidence to suggest that possessing the 1996 voter list would have permitted Coleman to acquire additional signatures; rather, it may simply have helped her to verify those that were already collected.

At best, therefore, possession of the old voter list would have informed Coleman more clearly that she was not on pace to obtain the requisite 300 signatures. Still, the Court believes that Coleman should nevertheless have been able to ascertain this status on her own. The petitions of the other two candidates reveal that even with access to the 1996 voter list, they still had a fairly high percentage of signatures rejected by the CEO; the difference between those petitions and that of Coleman was simply that they turned in a greater aggregate number of signatures.[2] If Coleman was concerned about not having the old voter list, she could have begun her collection effort earlier and made certain to obtain enough signatures to provide a comfortable buffer against those undetermined number which would ultimately be rejected. Indeed, after her petition was denied on September 1, Coleman was able within a matter of days to collect an additional 150 signatures to supplement her petition; had such a concerted effort been launched only one week earlier, Coleman's petition may very well have been successful.[3]

---

[2] The documents presented at the evidentiary hearing show that Faleomavaega's petition included a total of 483 names, with 375 accepted (77.6%) and 108 rejected (22.3%). Seigafolava's petition included a total of 398 names, with 335 accepted (84.2%) and 63 rejected (15.8%). Coleman's petition included just 336 names. To achieve the goal of 300 valid signatures, she would have needed 89.3% of her total to be accepted by the Election Office, a rate significantly *above* that achieved by either of the candidates who allegedly "benefited" from the possession of the 1996 voter registration list.

[3] The Court agrees with the CEO that he was under no legal obligation

Even viewing the numbers in a light most favorable to Coleman and assuming the validity of those affidavits tentatively accepted by the CEO, Coleman still has a total of only 263 out of the required 300 valid signatures.[4] Moreover, at the hearing she did not even make the contention that she could prove the validity of the 37 necessary additional signatures out of the 73 which remain unverified. Because we reject the notion that possession of the old voter list would have resulted in a greater aggregate number of signatures on her petition, and since she has now had ample time with the assistance of such list—as well as an opportunity to present evidence directly to this Court—to prove the validity of those signatures which were submitted in a timely fashion, we conclude that Coleman was not unduly disadvantaged by being deprived of the 1996 voter registration list.

B. Scrutiny Applied to Coleman's Petition

■ Coleman further argues that her petition was subjected to a higher degree of scrutiny than were those of her competitors. As discussed above, however, as the petitioner in this case, Coleman must demonstrate that the CEO acted in an unlawful, arbitrary or capricious manner with respect to her petition. Except for vague references in the testimony to possible situations where other candidates submitted multiple signatures that may have been signed by the same person, the record is bare with regard to these allegations. Although Coleman elicited testimony about the review of her own petition, she failed to produce any evidence regarding the process that was followed with respect to the petitions of her competitors. Reviewing once again the numbers set forth in footnote 2, *supra*, each of the other two candidates appear to also have had a substantial number of their submitted signatures rejected. At this point, over 78% of Coleman's signatures have been accepted, a higher rate than that of Faleomavaega. Given these figures and the paucity of evidence to the contrary, we are not prepared to conclude that the review of Coleman's petition by the CEO was in any way extraordinary.

---

to include in his count these 150 supplemental signatures which were submitted after the deadline.

[4] Of the 336 signatures submitted on September 1, the CEO and his staff originally accepted only 180. After further review, an additional 54 signatures were verified, bringing the total to 234. The testimony at the hearing indicated that recently the Election Office had tentatively accepted another 29 signatures based on affidavits provided by Coleman.

## C. The CEO's Refusal to Consider Additional Evidence

■ The Court recognizes that Coleman and her staff have gone to great lengths during the past six weeks to attempt to bolster her petition by providing the CEO with further signatures, affidavits, and other evidence. At one point, the CEO even allegedly instructed Coleman to bring in live witnesses to verify their signatures, and then subsequently refused to consider their testimony. While we are sympathetic to the frustrations which such actions may have caused, Coleman nevertheless had the opportunity to present directly to the Court any evidence allegedly not considered by the CEO. Having failed to do so, we decline to now rule that the CEO's refusal to consider such evidence rose to the level of arbitrary and capricious behavior.

## **Order**

For the foregoing reasons, the petition is denied.

It is so ordered.